UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| DESIGN PALLETS, INC., a Florida corporation,<br><br>Plaintiff,<br><br>vs.<br><br>SHANDON VALLEY TRANSPORT SOLUTIONS USA, LLC a/k/a SVTS GLOBAL, a Colorado limited liability company, ADAM M. PENER, COLIN D. CLARK, STEVEN C. DAVIS, and DAVID W. FELL,<br><br>Defendants. | CASE NO: 6:12cv669-Orl-31DAB |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff, Design Pallets, Inc. (hereinafter "DPI" or "Plaintiff"), hereby sues Defendants, Shandon Valley Transport Solutions USA, LLC a/k/a SVTS Global ("SVTS"), Adam M. Pener ("Mr. Pener"), Colin D. Clark ("Mr. Clark"), Steven C. Davis ("Mr. Davis"), and David W. Fell ("Mr. Fell") and states:

**Parties, Jurisdiction and Venue**

1. DPI is a Florida corporation incorporated January 31, 2000, with its principal place of business in Apopka, Orange County, Florida.

2. SVTS is a Colorado limited liability company organized on February 20, 2009 with its principal place of business in Parker, Colorado.

3. Mr. Pener is a Colorado resident who is President of SVTS and Member of its Board of Managers.

4. Mr. Clark is a Colorado resident who is Chief Executive Officer of SVTS and a founder.

5. Mr. Davis is a resident of Oklahoma and an investor in SVTS.

6. Mr. Fell is a resident of Colorado and an investor in SVTS.

7. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) as the parties are citizens of different States and the matter in controversy exceeds the sum or value of $75,000.00, excluding interest, attorneys' fees and costs. This Court also has federal question jurisdiction as this matter involves patents. 28 U.S.C. § 1338(a).

8. This Court has personal jurisdiction over the Defendants under Florida's Long-Arm Statute because they are committing tortious acts and breaching a contract within this State under section 48.193(1)(b) & (g), Florida Statutes.

9. Defendants have sufficient minimum contacts with Florida, as they were selling products designed by Plaintiff in Florida, corresponding with shareholders of the Florida corporation on a daily or weekly basis, and sending payments to Plaintiff in Florida, so as to satisfy the due process requirements of the Fourteenth Amendment of the United States Constitution.

10. Venue is proper in the Middle District of Florida pursuant to a forum selection clause in a contract, and under 28 U.S.C. § 1391(b)(2) because this judicial district is where a substantial part of the events or omissions giving rise to the claim occurred.

## General Allegations

11. This is a case in which SVTS approached Plaintiff for an exclusive license to distribute corrugated pallets in a certain territory, but set up a payment schedule it could not

make. Under pressure from investors who had contributed $1.6 million or more toward a distributorship that still had not made its initial payment under the contract, Defendants fraudulently induced Plaintiff to reduce the amount of the initial payment to the $1.6 million previously paid, and then alleged breaches of contract to excuse their non-performance as to future payments and claim the intellectual property for themselves.

*A. Plaintiff's Patented Inventions.*

12. Plaintiff owns patented designs of shipping pallets that are made of corrugated paper as opposed to traditional wood pallets. DPI's corrugated pallet designs are strong enough to transport the vast majority of shipments in interstate commerce. They are lighter, less expensive, safer, and more environmentally friendly than wood.

13. Plaintiff's intellectual property is extremely valuable. It incorporates years of knowledge and know-how, and includes five issued U.S. patents, as well as several patents pending, and employs engineers who take features from those patents to custom-build in the dimensions that best suit the applications of the end user.

14. Plaintiff owns the copyright in its website content and written materials, claims trademark rights in its "Loadek" brand of pallets, and developed certain trade secrets regarding engineering designs, customer information, savings calculators, pricing data, and other valuable business information that is not generally known to others who could use it.

15. When a distributor asks to do business with DPI, it is first required to sign a non-disclosure agreement. The distributor will then execute a written license agreement to use DPI's intellectual property under specified terms, including royalty payments. Some

distributors are existing distributors of wood pallets who desire the option to offer corrugated pallets as an alternative.

16. In the typical distributorship arrangement, an end-user will place an order with a distributor for corrugated pallets in particular dimensions, depending on the application (i.e., what products will be shipped on the pallets). The distributor fills out a DP-1 form with detailed information and sends it to DPI to design the pallet. Designs are provided to the distributor, who sends them to a box plant or corrugator to cut a sample. After testing, the sample goes to a die manufacturer to create a die, which goes back to the box plant or corrugator so that the pallets can be mass produced. The pallets are then created, stacked, wrapped, and shipped by truck directly to the end user, who loads its products on the pallets for transport.

*B. DPI's License Agreement with SVTS.*

17. In 2009, Mr. Clark formed SVTS and approached DPI about becoming a distributor in five U.S. states, with an emphasis on California, and in the country of Mexico.

18. When Mr. Clark offered to pay DPI $14 million plus a 13% royalty on the sales of each pallet for the distribution rights to that territory, in the presence of Mr. Clark's counsel, Plaintiff in good faith told Mr. Clark his offer was much too high, as the market demand for corrugated pallets at that time would not produce sufficient revenues to sustain a 13% royalty, and that $14 million may be overly burdensome. The parties subsequently agreed to a $7 million payment, plus an 8% royalty, and SVTS had its counsel draft the contract.

19. On or around March 19, 2010, SVTS entered into an Exclusive License and Distribution Agreement with DPI (the "License Agreement"). A true and correct copy is attached hereto as **Exhibit "A."**

20. The License Agreement provides, in relevant part:

a. SVTS had made a down payment of $295,000 and owed another $555,000 upon execution of the License Agreement (this was paid), with another $950,000 due on or before June 1, 2010, which together would constitute a $1.8 million "Initial Payment" and serve as the "Funding Date." *See* sections 2.01 and 5.01.

b. In the event that SVTS "fails to make the Initial Payment" then "at Manufacturer's option, this Agreement shall terminate and be of no further force or effect [except for terms that survive termination]." No notice was required. *See* section 2.01.

c. The remaining four payments were to be made every six months over the next two years, each with a 10 day grace period, for a total of $7 million. *See* section 5.01.

d. The Term of the patent license was until the last patent expiration date, covering the Territory of California, Texas, Arizona, Colorado, New Mexico, and the country of Mexico, which could be expanded if SVTS exercised certain options. *See* section 1 ("Term" and "Territory").

e. The patent license and distributorship rights were exclusive within the Territory and non-exclusive outside the Territory, including the right

to sublicense within the Territory. The parties made a special carve-out for an existing distributor, Sonoco Products Company. *See* sections 2.02 and 2.03.

f. SVTS was only entitled to sell pallets to customers outside the Territory if it notified DPI of a customer contact at the executive level in writing and satisfied other requirements. *See* section 2.07.

g. If SVTS defaulted on its payment schedule, after the Initial Payment, it still could retain a license, but only with respect to those portions of the Territory that had a cumulative monetary value (according to a chart) up to the amount paid, and nowhere outside the Territory. *See* section 5.02.

h. SVTS had a minimum annual sales volume over the first five years and if it could not make up the shortfall in the following year, DPI could require that SVTS terminate its exclusive rights with respect to specific states in the Territory, selected by SVTS, based on the percentage of missed sales volume. *See* section 5.03.

i. SVTS had to pay DPI an 8% royalty on the production fee for all pallets sold by SVTS, payable no later than 30 days after the end of each fiscal quarter. *See* section 5.04.

j. In partial consideration for the payments to be made by SVTS, DPI would issue SVTS 1,800,000 shares of common stock, and upon receipt of the Initial Payment, SVTS would receive 850,000 of those

shares, with the balance to be issued, if at all, on a prorated basis in accordance with additional payments made. *See* section 2.06.

k. Neither party could use or disclose to others, either before or after the License Agreement ended, any technical or business information, manufacturing technique, process, experimental work, trade secret or other confidential matter relating to the other party. *See* section 11.01.

l. SVTS could not apply for registration of any trademarks for the products in the Territory. *See* section 13.03.

m. A breach of the terms of the License Agreement that was not cured within 30 days after written notice constituted a default, which gave the non-defaulting party the right to injunctive relief, specific performance or other rights at law or in equity. *See* sections 15.01(b) and 15.02.

n. Upon termination of the License Agreement, all further rights of the parties ceased, except that the parties were not relieved of their obligations to pay amounts that were due or became due after termination, or of other surviving obligations. *See* section 15.03.

o. Florida law governed, and the parties irrevocably submitted to jurisdiction and venue in Florida state courts or the U.S. District Court for the Middle District of Florida. *See* section 16.04.

21. Soon after executing the License Agreement in March 2010, SVTS realized it would not be able to make the $950,000 payment due June 1, 2010.

22. On June 1, 2010, to accommodate SVTS, the parties entered into a First Amendment to Exclusive License and Distribution Agreement ("First Amendment") by which SVTS paid $410,000 and DPI agreed to accept the remaining $540,000 of the $950,000 by October 1, 2010, as the new "Funding Date." A true and correct copy is attached hereto as **Exhibit "B."**

23. In September 2010, DPI provided a thorough training seminar for SVTS in Apopka, FL.

24. On October 1, 2010 SVTS failed to make the $540,000 payment when it came due or 10 days thereafter. Therefore, pursuant to section 2.01, DPI had the option to terminate the License Agreement without notice.

25. In November 2010, DPI elected to work with another distributor in New Mexico, Pallets Unlimited, International ("PUI"), but gave SVTS another chance to raise the funds necessary to become an exclusive distributor, at least in some part of the Territory.

*C. The May 2011 Second Amendment*

26. Mr. Pener and Mr. Clark felt immense pressure from its investors because SVTS had only a contract terminable at will by DPI, and no entitlement to any shares of DPI's stock. This pressure was communicated many times when Mr. Clark stated to several employees of DPI his fear of "going to jail" at the hands of disgruntled shareholders who many have been overpromised certain things.

27. By February 2011, SVTS had paid DPI $1.6 million but was still $200,000 short of the required Initial Payment. It had also filed two federal trademark applications for

"Green Ox" pallets, wherein SVTS indicated that it first sold these products in interstate commerce on December 16, 2010.

28. By March 2011, Mr. Pener and Mr. Clark had implemented a scheme to fraudulently induce DPI into a Second Amendment that would reduce the Initial Payment to the $1.6 million already paid, claim certain contractual rights, and then never pay another dime to DPI.

29. Specifically, after consultations with investor Jim Russell, who allegedly had already invested $1 million, Mr. Pener and Mr. Clark told DPI that Mr. Russell was willing to invest another $2.5 million following his review of an executed Second Amendment, and that 70% of that sum would be applied immediately toward the next installments.

30. On April 27, 2011, Mr. Pener wrote an e-mail to DPI, copying Mr. Clark, stating that he had spoken with Mr. Russell that morning and confirmed "a willingness to reengage on the DPI $2.5mm investment following his review of the executed Addendum." A true and correct copy of the e-mail is attached hereto as **Exhibit "C."**

31. On May 11, 2011, in reliance on that e-mail and similar telephone conversations with Mr. Clark and Mr. Pener, DPI entered into a Second Amendment to the License Agreement with SVTS ("Second Amendment"). A true and correct copy is attached hereto as **Exhibit "D."**

32. The Second Amendment stated that DPI acknowledged the $1.6 million from SVTS "satisfies all of SVTS's obligations under the Agreement with respect to the Initial Payment" and that the "Funding Date" shall mean May 11, 2011. The remaining payment dates were backed up to six month intervals from May 11, 2011, such that the next

installment of $1.25 million would be due November 11, 2011, although SVTS had no intention or ability to make these future payments.

33. Upon information and belief, Mr. Russell did not invest the $2.5 million, nor did he ever intend to invest.

*D. SVTS Distances Itself from DPI and Declares Breaches*

34. With the Second Amendment executed, SVTS immediately began distancing itself from DPI, marking a stark transition from a previously smooth course of dealing. For example, in June 2011, Mr. Clark flew to Orlando and told Doug Olvey, DPI's president, that another executive of DPI, Joe Danko, was damaging the relationship between the parties, particularly with Mr. Pener.

35. On June 16, 2011, Mr. Danko wrote an e-mail to Mr. Pener stating this was "a major shock" and on June 17, 2011, Mr. Pener responded "I shared your shock," explaining the relationship had "always been positive, friendly, and I respect greatly the work you've done to advance the interests of DPI and support SVTS."

36. On June 24, 2011, DPI and SVTS had a business meeting with Walmart at its headquarters in Arkansas. Soon after it began, Mr. Clark boldly attempted to take over the meeting, offending the Walmart representative, and claimed to be the "exclusive distributor" of DPI's pallets, which was not true.

37. SVTS had also begun taking a number of actions that were detrimental to, or competitive with, DPI, including, but not limited to:

a. Doing business as "SVTS Global" with stylized lettering and a logo of a tree inside a circular arrow, which was not the name of the entity that

had signed the License Agreement and gave the distinct misimpression that SVTS had global rights;

b. Reproducing DPI's copyrighted website content onto its own website;

c. Using its "Green Ox" trademarks to identify the source of the goods that were based on DPI's designs;

d. Selling to customers outside the Territory without providing notice to DPI;

e. Failing to complete DP-1 forms so that DPI could not identify SVTS's end users;

f. Forming partnerships with third-party distributors outside the Territory such as Paradigm Pallets, Inc., Reliable Pallet Marketing, and Global Transport Solutions;

g. Providing another distributor outside the Territory, T.S.S. Global, with website material that contained DPI's confidential information and intellectual property; and

h. Otherwise disclosing DPI's confidential information to others.

38. SVTS never once paid royalties, and it failed to reach the minimum sales volumes set forth in the License Agreement.

39. SVTS also began to complain about PUI, which it knew about prior to signing the Second Amendment. PUI had not made a single sale for DPI, and DPI offered to assign PUI to be an SVTS distributor. Mr. Clark rejected the offer, telling DPI he "needed something to beat you over the head with."

40. Upon information and belief, SVTS was misrepresenting to its investors and potential investors that it had, or was obtaining, the intellectual property rights necessary to expand its business globally, and was not a mere "distributor."

*E. SVTS Demands Joint Venture with Worldwide Rights and Threatens Lawsuit*

41. On July 1, 2011, less than two months after the Second Amendment, Mr. Clark wrote a lengthy e-mail to Mr. Olvey stating that Mr. Clark has not exhibited "one iota of guile or deceit" and that his goal was to fund a project "without allowing anyone to steal it from you." He said, "I am not trying to take advantage of you" and that he needed to "stay out of jail" because his "ass is on the line." Mr. Clark proposed a new "joint venture" so that he could "re-start" the venture with a "clean slate." Mr. Clark said this was "100% my idea" but he had to run it by Mr. Pener and legal. A true and correct copy of the e-mail is attached hereto as **Exhibit "E."**

42. On October 10, 2011, Mr. Pener sent a letter with a joint venture proposal, and on October 14, 2011, DPI declined the proposal.

43. On October 14, 2011, Mr. Pener signed a Form D Notice of Exempt Offering of Securities with the SEC, indicating a $1.2 million sale amount as of October 3, 2011.

44. On October 19, 2011, having recently acquired a lawyer, Mr. Davis, as its "newest investor," SVTS gave notice of breach to DPI. SVTS stated there were "some serious legal issues between the firms that must be addressed to SVTS's satisfaction should DPI stand by its decision not to move forward with the JV." Even if there could have been a breach, and if the Second Amendment had not been procured by fraud, SVTS would have missed its November 11, 2011 payment before the end of DPI's 30-day cure period.

45. On December 29, 2011, after formal letters were exchanged by the parties, SVTS filed a lawsuit against DPI in Colorado state court, in contravention of the forum selection clause in the License Agreement. Mr. Fell, who was both an investor in SVTS and a lawyer negotiating the License Agreement, had initially drafted the forum selection clause for Colorado, then agreed to substitute the state of Florida for Colorado, only to then disregard the clause when his law firm filed the pleading.

46. SVTS did not notify DPI that a lawsuit was filed, and did not make any attempt to serve process for months. SVTS and Mr. Fell had ex parte communications with the judge in Colorado, through motions requesting extensions of the service deadline, alleging that they were in "settlement negotiations" with DPI, leading the court to believe that DPI had knowledge of the lawsuit.

47. On February 14, 2012, representatives of the parties met at the law offices of one of SVTS's investors, Mr. Davis, in Oklahoma City, OK. During the meeting, Mr. Davis demanded worldwide licensing rights through a joint venture agreement and warned that, if DPI refused, he had "deep pockets" to bury DPI in expensive litigation. Both Mr. Davis and Mr. Fell, whose law firm had filed the complaint, effectively took Mr. Olvey's deposition at this meeting without giving any notice that a lawsuit was pending.

48. On February 16, 2012, Mr. Davis sent a follow-up e-mail stating that he had absolutely no "hidden agenda" and that he was "certain there is nothing SVTS is holding in its back pocket as you say." He said there are no alleged "gotchas." He continued that "Again, I have no hidden agenda, and don't know of anything you are not already aware of." A true and correct copy of the e-mail is attached hereto as **Exhibit "F."**

*F. DPI Faces Two Lawsuits and Loss of Intellectual Property*

49. On April 3, 2012, after the Colorado judge had given a final extension of the service deadline, DPI was served with process and first learned of the lawsuit.

50. On April 5, 2012, SVTS, through counsel in Ft. Myers, FL, demanded inspection of corporate documents under the Florida Statutes within 5 days, claiming SVTS was a shareholder of DPI. Despite a request for an extension of time to respond, SVTS quickly filed another lawsuit, following through on Mr. Davis's promise of using the expense of litigation to force the SVTS agenda.

51. On April 10, 2012, SVTS sent a letter to DPI stating that, because DPI was unable or unwilling to provide custom design services, in order to "mitigate" SVTS's damages, SVTS would be "designing, testing and producing its own custom designs for prospects and clients from this point forward." The letter states, "Please be informed that because these designs will have employed SVTS resources and SVTS intellectual property, we view such custom designs and improvements to be the confidential, and proprietary, intellectual property of SVTS." In boldfaced text, it continues "**DPI is hereby strictly prohibited from sharing such designs with any distributor of DPI's pallets**." A true and correct copy of the letter is attached hereto as **Exhibit "G."**

52. In summary, within approximately two years, SVTS had signed a contract in March 2010 agreeing to payment terms it could not make, began selling its own "Green Ox" products as early as December 2010, fraudulently induced a Second Amendment in May 2011, and simply used DPI to become a competitor. Defendants also demanded worldwide rights, threatened protracted litigation to force DPI to comply with their demands, and

secretly filed a lawsuit in Colorado in contravention of the forum selection clause its own attorneys drafted.

53. As a result of these actions, Plaintiff has lost control of its intellectual property, as well as multiple business opportunities, and spent enormous time, money and resources to, in effect, create its largest competitor. It has sustained a loss of valuable customers, specific and prospective sales leads, customer goodwill, and injury to business and reputation.

54. Plaintiff should be awarded significant punitive damages against Defendants for their intentional, wanton, and egregious actions.

55. Plaintiff has retained the law firm of Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., agreeing to pay a reasonable fee for services rendered.

56. All conditions precedent to the maintenance of this action have occurred, been performed, or been waived.

## COUNT I
## Patent Infringement Against All Defendants

57. This is an action for temporary and permanent injunction, and damages, against all Defendants for patent infringement.

58. Plaintiff re-alleges and incorporates herein paragraphs 1-56 above.

59. Plaintiff holds the patents to the corrugated pallet designs that were the subject of the License Agreement.

60. SVTS is no longer operating under the License Agreement.

61. Defendants are continuing to promote, market and sell the goods that were subject to the License Agreement and otherwise provided to them by Plaintiff, without authority, during the terms of the patents.

62. As a direct and proximate result of the Defendants' acts, Plaintiff has suffered, and continues to suffer, irreparable harm.

63. Money damages are insufficient to remedy the harm suffered by Plaintiff, which includes, but is not limited to, loss of valuable customers, specific and prospective sales leads, customer goodwill, and injury to business and reputation.

64. Plaintiff has no adequate remedy at law and is entitled to injunctive relief.

65. Plaintiff has a substantial likelihood of success on the merits, and a temporary injunction will serve the public interest.

66. As a direct and proximate result of these wrongful acts, Plaintiff has suffered, and will continue to suffer, substantial damages until the wrongful acts cease or are enjoined.

WHEREFORE, Plaintiff, Design Pallets, Inc., respectfully requests that this Court grant temporary and permanent injunctive relief enjoining Defendants, Shandon Valley Transport Solutions USA, LLC, Adam Pener, Colin D. Clark, Steven C. Davis and David W. Fell, either themselves or through others, from directly or indirectly promoting, marketing or selling any products that were subject to the License Agreement, or using any confidential information that was disclosed in connection with the License Agreement, or were otherwise obtained from Plaintiff, and award damages to Plaintiff that are incurred through the date that the wrongful acts cease or are enjoined, as well as punitive damages, interest, attorneys' fees and costs, and such further relief as this Court deems just and appropriate.

## COUNT II
## Breach of License Agreement Against SVTS

67. DPI re-alleges and incorporates herein paragraphs 1-56 above.

68. The License Agreement constituted a valid contract between the parties.

69. DPI fully performed under the License Agreement.

70. As set forth above, SVTS breached various provisions of the License Agreement, including, but not limited to:

a. Section 2.01 for failing to make the Initial Payment "simultaneously with the execution of the License Agreement";

b. Section 2.01 for failing to make the $1.8 million Initial Payment;

c. Section 2.02 for using the patents not "in accordance with the terms and conditions set forth herein";

d. Section 2.03 for exercising distribution rights not "in accordance with the terms and conditions set forth herein";

e. Section 2.07 for selling pallets with customers outside the Territory without notifying Plaintiff "of a customer contact at the executive level in writing" and obtaining "a letter of intent" with the required orders;

f. Section 4.08 for making improvements to the products rather than requesting that Plaintiff "promptly make such improvements and modifications as requested by" SVTS;

g. Section 5.01 for failing to make the scheduled payments;

h. Section 5.02 for retaining exclusivity for portions of the Territory where no "cumulative payment has been made" prior to a payment default;

i. Section 5.03 for retaining exclusivity for portions of the Territory after failing to meet the minimum sales volumes and not "selling an

additional number of Pallets in the next succeeding year to eliminate the shortfall from the prior year";

j. Section 5.04 by failing to "pay Manufacturer a royalty of 8% of the Production Fee fro all Pallets sold by" SVTS;

k. Section 11.01 for failing to "hold in strict confidence" and not using or "disclosing to others" either before or after termination or expiration of the Agreement, "any technical or business information, manufacturing technique, process, experimental work, trade secret or other confidential matter relating to the other party";

l. Section 13.03 for violating the covenant that it would "not apply for registration of any Trademarks in the Territory";

m. Section 16.04 for violating the agreement to "consent to the jurisdiction" of the courts in Florida.

71. As a direct and proximate result of the breaches, Plaintiff suffered damages.

WHEREFORE, Plaintiff, Design Pallets, Inc., demands judgment against Defendant Shandon Valley Transport Solutions USA, LLC for damages, interest, attorneys' fees, costs, and such further relief as this Court deems just and appropriate.

**COUNT III**
**Misappropriation of Trade Secrets Against All Defendants**

72. This is an action for misappropriation of trade secrets against all Defendants under Fla. Stat. § 688.001 *et seq*.

73. DPI re-alleges and incorporates herein paragraphs 1-56 above.

74. Throughout their affiliation with DPI, Defendants acquired trade secrets from DPI and used them for their own exclusive benefit, and for the benefit of third parties, without express or implied consent of DPI.

75. The trade secrets (hereinafter "Trade Secrets") included, but were not limited to, the methods of designing and building corrugated pallets using various elements from DPI's patented designs.

76. At the time Defendants used the Trade Secrets, they knew or had reason to know their knowledge of the Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

77. The Trade Secrets derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

78. The Trade Secrets were the subject of efforts that were reasonable under the circumstances to maintain their secrecy.

79. As a direct and proximate result of the misappropriation, DPI has suffered, and continues to suffer, irreparable harm.

80. Money damages are insufficient to remedy the harm suffered by DPI, which includes, but is not limited to, loss of valuable customers, specific and prospective sales leads, customer goodwill, and injury to business and reputation.

81. DPI has no adequate remedy at law and is entitled to injunctive relief.

82. DPI has a substantial likelihood of success on the merits, and a temporary injunction will serve the public interest.

83. As a direct and proximate result of these wrongful acts, DPI has suffered, and will continue to suffer, substantial damages until the wrongful acts cease or are enjoined.

84. Pursuant to Fla. Stat. § 688.003, DPI is entitled to injunctive relief against Defendants.

85. Pursuant to Fla. Stat. § 688.004, DPI may recover damages against Defendants.

86. Pursuant to Fla. Stat. § 688.005, DPI may recover an award of attorneys' fees and costs against Defendants for willful and malicious misappropriation.

WHEREFORE, Plaintiff, Design Pallets, Inc., respectfully requests that this Court grant temporary and permanent injunctive relief enjoining Defendants, Shandon Valley Transport Solutions USA, LLC, Adam Pener, Colin D. Clark, Steven C. Davis and David W. Fell, either themselves or through others, from directly or indirectly using any of Plaintiff's trade secrets, and award damages to Plaintiff that are incurred through the date that the wrongful acts cease or are enjoined, as well as punitive damages, interest, attorneys' fees and costs, and such further relief as this Court deems just and appropriate.

**COUNT IV**
**Rescission and Fraudulent Inducement Against SVTS, Mr. Pener and Mr. Clark**

87. DPI re-alleges and incorporates herein paragraphs 1-56 above.

88. As stated in paragraphs 26-33 above, SVTS, Mr. Pener and Mr. Clark made false statements regarding a material fact that Jim Russell would provide a $2.5 million investment if DPI agreed to the Second Amendment in May 2011.

89. SVTS, Mr. Pener and Mr. Clark knew or should have known the representation was false.

90. SVTS, Mr. Pener and Mr. Clark intended that the representation induce DPI to act on it.

91. As a direct and proximate result of the representation, DPI has been damaged.

92. DPI received no benefits from the Second Amendment and has given notification that it is rescinded.

93. DPI has no adequate remedy at law and is entitled to rescind the Second Amendment.

WHEREFORE, Plaintiff, Design Pallets, Inc., demands rescission of the Second Amendment and an award of damages against Defendants Shandon Valley Transport Solutions USA, LLC, Adam Pener, and Colin D. Clark, as well as punitive damages, interest, attorneys' fees, costs, and such further relief as this Court deems just and appropriate.

**COUNT V**
**Promissory Estoppel Against SVTS, Mr. Pener and Mr. Clark**

94. DPI re-alleges and incorporates herein paragraphs 1-56 above.

95. As stated in paragraphs 26-33 above, SVTS, Mr. Pener and Mr. Clark made a representation of material fact that Jim Russell would provide a $2.5 million investment if Plaintiff agreed to the Second Amendment in May 2011.

96. This representation was contrary to a later-asserted position that they made no such promise.

97. DPI reasonably relied on the representation.

98. DPI detrimentally changed its position due to its reasonable reliance on the representation.

99. As a direct and proximate result of the representation, DPI has been damaged.